WHITMAN v CITY OF BURTON (ON SECOND REMAND)

Docket No. 294703. Submitted December 15, 2014, at Lansing. Decided
July 9, 2015, at 9:00 a.m. Vacated in part 499 Mich ___.

Bruce Whitman sued the City of Burton and Mayor Charles Smiley
in the Genesee Circuit Court for wrongful termination in viola-
tion of the Whistleblowers' Protection Act (WPA). MCL 15.361 *et
seq.* Whitman claimed he was not reappointed to his position as
chief of police for the city of Burton because he challenged an
agreement made by city department heads to forgo payment for
unused leave time in order to reduce the city of Burton's budget
deficit. According to Whitman, this agreement violated Burton
Ordinance 68-C, which provided city employees with the benefit
of being paid for the unused leave time they had accumulated.
Whitman demanded, and ultimately received, payment for his
unused leave time. After a trial, a jury found in favor of Whitman.
The trial court, Geoffrey L. Neithercut, J., denied defendants'
motion for judgment notwithstanding the verdict (JNOV). Defen-
dants appealed in the Court of Appeals, and SAAD, P.J., and
O'CONNELL, J., (BECKERING, J., dissenting), reversed the trial
court's denial of defendants' motion for JNOV because Whitman
admittedly sought payment for his unused leave time for personal
reasons. 293 Mich App 220 (2011). The Supreme Court reversed
the Court of Appeals' decision and remanded the case to the Court
of Appeals for consideration of the remaining issues on which the
Court of Appeals did not rule, including whether Whitman
satisfied the causation requirement for a claim under the WPA.
493 Mich 303 (2013). On remand, the Court of Appeals, SAAD, J.
(O'CONNELL, P.J., concurring, and BECKERING, J., dissenting), again
reversed the trial court's denial of defendants' motion for JNOV
because Whitman's alleged whistleblowing activity did not fur-
ther the public interest. The majority ruled that Whitman's
conduct actually ran contrary to the public interest. The Court of
Appeals further held that the mayor's refusal to reappoint Whit-
man to the position of chief of police was unrelated to Whitman's
alleged whistleblowing, but was instead based on Whitman's
repeated misconduct while in the position of police chief. 305
Mich App 16 (2014). The day after the Court of Appeals issued its
second decision, the Supreme Court issued *Wurtz v Beecher Metro*

*Dist*, 495 Mich 242 (2014), which held that WPA protections do not apply to job applicants and prospective employees. On application for leave to appeal, the Supreme Court vacated the Court of Appeals' second decision and instructed it to review its ruling in light of *Wurtz*. 497 Mich 896 (2014).

On second remand, the Court of Appeals *held*:

1. Whitman was not entitled to WPA protections because he was merely a prospective employee after the mayor was reelected. The city of Burton's charter required the mayor to reaffirm or appoint his chief of police after reelection, and at that point, according to *Wurtz*, Whitman was only a candidate for the position, and the WPA does not apply to job candidates. Whitman emphasized that he was appointed to an indefinite term as police chief, and that he was terminated in violation of the WPA for reporting an ordinance violation. *Wurtz* requires that an individual claiming the protections of the WPA be an employee at the time of the alleged WPA violation. Whitman's four-year term as police chief concluded when the mayor was reelected. At that time, Whitman was simply a political appointee seeking reappointment—the equivalent of a prospective employee—and the WPA did not apply.

2. Whitman's alleged whistleblowing conduct, viewed objectively, did not advance the public interest; instead, his conduct ran contrary to the public interest. With the exception of Whitman, and in response to the city of Burton's budget crisis, the city administrators agreed to forgo payment for unused leave time and instituted a "use it or lose it" policy. Whitman demanded payment for his unused leave time and claimed that the agreement to forgo payment violated the ordinance that provided the benefit of payment for unused leave time to nonunionized city employees. The Court disagreed with Whitman that reporting this ordinance "violation" served the public interest because the Court concluded that the ordinance itself did not promote the public interest—that section of the ordinance simply established an employment perk. The Court also noted that the administrators' agreement to forgo payment for leave time would prevent layoffs that would result in reduced services to the public. The public interest would certainly not be promoted if the city was forced to operate with a fewer number of employees. Therefore, Whitman's demand for payment, and his refusal to abide by an agreement that would ease the city's budget deficit, worked against the public interest.

3. The mayor did not reappoint Whitman to the position of police chief because of Whitman's misconduct while in office during the four years he held the position before the mayor's

reelection. The mayor's decision was not based on Whitman's alleged whistleblowing that occurred long before the mayor's reelection. The length of time between an alleged act of whistleblowing and an adverse employment decision is not dispositive of retaliation, but a significant span of time between the whistleblowing and the adverse employment action weighs against finding a causal connection between the two. Whitman's adverse employment action occurred approximately four years after he reported the alleged ordinance violation. There was no temporal proximity between the alleged whistleblowing and the adverse employment action. The lack of temporal proximity, coupled with the mayor's claim that he decided against reappointing Whitman as police chief due to Whitman's misconduct while in office, clearly indicates that the mayor's refusal to reappoint Whitman was unrelated to Whitman's alleged whistleblowing.

Reversed and remanded.

BECKERING, J., dissenting, concluded that the WPA's protections did apply to Whitman because at the time of the mayor's reelection, Whitman qualified as an at-will employee with an indefinite term of employment, that is, an employee covered by the WPA. *Wurtz* clearly stated that prospective employees are not covered by the WPA for adverse employment actions, but it made no judgment about employees who are not fixed-term employees, and whose term of employment was indefinite and did not expire under a contract. Judge BECKERING noted that Whitman's indefinite term of employment carried with it the express option of being continued by reaffirmation—much like a contract with a renewal clause. Because of that, any decision to terminate Whitman's employment, if motivated by protected activity, violated the WPA. Judge BECKERING also concluded that there was enough evidence to justify having a jury decide the question of causation. In addition, Judge BECKERING disagreed with the majority's consideration of Whitman's motive for insisting that the city of Burton comply with the ordinance granting the benefit of being paid for unused leave time. According to Judge BECKERING, the Supreme Court has expressly and repeatedly admonished courts not to consider a plaintiff's motives when determining whether a plaintiff has engaged in protected activity under the WPA because a plaintiff's motive is irrelevant, other than as it pertains to causation. And even if the majority's new requirement for a successful WPA claim were valid—that the law or regulation or rule serve the public interest—Judge BECKERING asserted that the ordinance at issue was not unquestionably and objectively contrary to the public interest, as alleged by the majority.

1. WHISTLEBLOWERS' PROTECTION ACT — APPLICATION — PROSPECTIVE EMPLOY-
EES.

The Whistleblowers' Protection Act (WPA) does not apply to pro-
spective employees or candidates for hire; an individual must be
employed at the time of the adverse employment decision to
benefit from the protections of the act.

2. WHISTLEBLOWERS' PROTECTION ACT — PLAINTIFF'S CONDUCT — ADVANCING THE
PUBLIC INTEREST.

To qualify for the protections offered by the WPA, an individual's
whistleblowing conduct must promote the public interest.

3. WHISTLEBLOWERS' PROTECTION ACT — PROTECTED ACTIVITY AND ADVERSE
EMPLOYMENT DECISION — CAUSATION — TEMPORAL PROXIMITY.

Temporal proximity between an adverse employment decision and
the conduct protected by the WPA is a factor to consider when
determining whether there is a causal connection between the
two events, but temporal proximity is not dispositive of such a
determination.

*Tom R. Pabst* for plaintiff.

*Plunkett Cooney* (by *Ernest R. Bazzana, Audrey
Forbush,* and *Mary Massaron*) for defendants.

ON SECOND REMAND

Before: O'CONNELL, P.J., and SAAD and BECKERING,
JJ.

SAAD, J.

I. PROCEDURAL HISTORY[1]

This is the third time we have addressed this case on
appeal. Our Court originally adjudicated this alleged
Whistleblowers' Protection Act[2] (WPA) claim in 2011,

---

[1] A summary of the facts relevant to this opinion can be found at
*Whitman v City of Burton*, 293 Mich App 220, 222-228; 810 NW2d 71
(2011) (*Whitman I*), and at *Whitman v City of Burton*, 493 Mich 303,
306-311; 831 NW2d 223 (2013) (*Whitman II*).

[2] MCL 15.361 *et seq.*

and our opinion[3] reversed the jury award in Whitman's favor. We held that the Michigan Supreme Court's decision in *Shallal*[4] barred Whitman from claiming protection under the WPA, because he admitted that his motivation for asserting his entitlement to accumulated, unused sick-leave pay under a city ordinance was entirely personal and selfish.[5] We reasoned that, under *Shallal*, Whitman's private motivations for asserting defendants' noncompliance with the city ordinance disqualified him from WPA protections, because he did not act as a whistleblower under the meaning of the WPA. We dismissed his case on this narrow ground, and further held in a footnote that "overwhelming evidence of plaintiff's misconduct in office . . . more than justified the mayor's decision not to reappoint plaintiff as police chief."[6]

The Michigan Supreme Court reversed, and disavowed what we thought was the principle articulated in *Shallal* on the dispositive nature of Whitman's private motivations.[7] It remanded the case and instructed us to address "all remaining issues on which [we] did not formally rule, including whether the causation element of the [WPA] has been met."[8]

Because our narrow 2011 ruling regarding Whitman's private motivation meant that we did not look at

---

[3] *Whitman I*, 293 Mich App 220.

[4] *Shallal v Catholic Social Servs of Wayne Co*, 455 Mich 604; 566 NW2d 571 (1997).

[5] Specifically, Whitman first voiced his opposition to modification of the city ordinance at issue by stating that "[m]y current life style revolves around these very things [i.e., the benefit of receiving payment for accumulated leave time] that have been negotiated for me . . . ." See *Whitman I*, 293 Mich App at 225.

[6] *Id.* at 232 n 1.

[7] *Whitman II*, 493 Mich at 306.

[8] *Id.* at 321.

the larger—and, to our minds, more important—
question of whether Whitman's conduct objectively
promoted the public interest, we addressed and de-
cided this issue on remand in 2014.[9] We held that the
purpose of the WPA is to advance the public interest,
and thus the statute protects only those plaintiffs
whose actions, irrespective of their personal motiva-
tions, objectively advance the public interest. And
because Whitman's conduct ran contrary to the public
interest, rather than advancing the public interest, we
held that Whitman was not protected by the WPA.

We further held, once again, but with fuller expla-
nation, that Whitman's alleged whistleblowing activity
was clearly not the reason the mayor refused to renew
his four-year term as chief of police. Instead, the
mayor's refusal to renew Whitman's four-year political
appointment was a direct result of Whitman's miscon-
duct during his previous term—misconduct that only
came to the mayor's knowledge during his postelection
review of his team of political appointees. It was this
review, and the information it revealed, that motivated
the mayor to refuse to reappoint Whitman to another
four-year term as chief of police.

The day after we issued our second decision on
appeal, the Michigan Supreme Court issued *Wurtz v
Beecher Metro Dist*,[10] which held that WPA protections
do not apply to "job applicants and prospective employ-
ees."[11] Then, on November 19, 2014, the Michigan Su-
preme Court vacated our 2014 decision and asked us to
review our ruling in light of *Wurtz*.[12] After our review of

---

[9] See *Whitman v City of Burton (On Remand)*, 305 Mich App 16; 850
NW2d 621 (2014) (*Whitman III*).

[10] *Wurtz v Beecher Metro Dist*, 495 Mich 242; 848 NW2d 121 (2014).

[11] *Id.* at 253.

[12] *Whitman v City of Burton*, 497 Mich 896 (2014) (*Whitman IV*).

*Wurtz*, we conclude that Whitman's claim must be dismissed under the holding and reasoning in that case.

Therefore, we now hold that Whitman's claim must be dismissed for any one or combination of the following reasons: (1) *Wurtz* requires its dismissal, (2) objectively, Whitman's conduct did not advance the public interest, but instead, it ran contrary to the public interest, and (3) the mayor's refusal to reappoint Whitman, a political appointee, to another four-year term as police chief was because of Whitman's misconduct in office, not the whistleblowing activity that allegedly took place long before his four-year term as chief had ended.

### II. STANDARD OF REVIEW

A trial court's ruling on a motion for judgment notwithstanding the verdict (JNOV) is reviewed de novo on appeal. *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263, 272; 696 NW2d 646 (2005). "When reviewing the denial of a motion for JNOV, the appellate court views the evidence and all legitimate inferences therefrom in the light most favorable to the nonmoving party to determine if a party was entitled to judgment as a matter of law." *Genna v Jackson*, 286 Mich App 413, 417; 781 NW2d 124 (2009).

### III. ANALYSIS

#### A. PLAINTIFF IS NOT ENTITLED TO WPA PROTECTION

##### 1. DEFENDANTS' ALLEGED WPA VIOLATION OCCURRED AFTER THE CONCLUSION OF PLAINTIFF'S TENURE AS POLICE CHIEF

###### a. LEGAL STANDARDS

MCL 15.362, the provision of the WPA under which plaintiff brought suit, states:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

In *Wurtz*, the Michigan Supreme Court clarified that these protections do not apply to job applicants and prospective employees,[13] because a job applicant or prospective employee cannot be "discharged, threatened, or otherwise discriminated against regarding his or her compensation, terms, conditions, location, or privileges of employment"[14]—only a *current* employee can suffer such mistreatment.[15] In other words, the WPA applies to an employer's improper actions regarding an individual's protected conduct only when the conduct occurs *during the course of his employment.*[16]

Accordingly, when it adjudicates a claim under the WPA, *Wurtz* emphasizes the plaintiff's employment status at the time the alleged WPA violation occurred.[17]

---

[13] *Wurtz*, 495 Mich at 253.

[14] *Id.* at 251.

[15] *Id.* at 253.

[16] *Id.* at 252 ("[A]s gleaned from the WPA's express language, the statute only applies to individuals who currently have the status of an 'employee.' ").

[17] *Id.* at 252. See also *id.* at 252 n 16:

We recognize that plaintiff was an employee at the time he engaged in protected activity. Significantly, however, plaintiff

If a defendant committed the alleged WPA violation during the course of a plaintiff's employment, the plaintiff's claim may proceed. If the defendant committed the alleged WPA violation when the plaintiff was not employed by the defendant, or when the plaintiff was a job applicant or prospective employee, the plaintiff's claim must fail.[18] Under *Wurtz*, this classification—employed versus not employed (as a job applicant, prospective employee, or former employee)—is the *only* classification a court may use to assess whether the WPA provides protection to a plaintiff.[19] For purposes of this determination, it is inconsequential whether the plaintiff was an at-will employee, contract employee, or just-cause employee—the plaintiff is protected by the WPA only if the alleged WPA violation occurred during the course of his employment.[20]

The Michigan Supreme Court applied these principles to Wurtz, a contract employee who worked for a local water and sewage district under a fixed term.[21] Wurtz wished to continue in his position after termination of his contract term, but the district declined to

---

makes no claim that his employment contract was in any way breached or that he was subject to a specific adverse employment action enumerated by the WPA during his contract term. Rather, plaintiff maintains that because he engaged in protected activity during his contract term, he has a right under the WPA to renewal of his contract.

[18] *Id.* at 253.

[19] Of course, as the Michigan Supreme Court stated, at-will employees—like any other kind of employee—are protected under the WPA against WPA violations allegedly committed by their employer *during the course of their employment.* See *id.* at 256-257. However, at-will employees—like any other kind of employee—are not protected under the WPA against WPA violations allegedly committed by their employer *after they are no longer employed.* See *id.* at 253.

[20] *Id.*

[21] *Id.* at 244-245.

renew his contract.[22] Wurtz then sued the district and alleged that it violated the WPA when it refused to renew his contract, because it supposedly did so in retaliation for actions he took during his employment.[23] The Michigan Supreme Court rejected Wurtz's claim because the WPA violation he claimed the district committed—its decision to not renew his contract— occurred *after* the conclusion of his contract term, when Wurtz was a job applicant or prospective employee.[24] Stated another way, because the WPA violation alleged by Wurtz did not take place during the course of his employment, Wurtz had no claim against the district under the WPA.[25]

In sum, *Wurtz* holds that when a plaintiff alleges that a defendant violated the WPA, a court must assess the claim by ascertaining whether the alleged WPA violation occurred *during the course of the plaintiff's employment* with the defendant. If the plaintiff was employed at the time of the alleged WPA violation, the plaintiff's case may proceed. If the plaintiff was not employed at the time of the alleged WPA violation, or was a job applicant or prospective employee at the time of the alleged WPA violation, the plaintiff's case must fail.[26] The plaintiff's classification while he was employed—i.e., as a contract, at-will, or just-cause employee—is irrelevant to the court's determination. The court's focus must be on whether the plaintiff, regardless of his classification, was employed by the defendant at the time the alleged WPA violation occurred.

---

[22] *Id.* at 246-247.

[23] *Id.* at 247.

[24] *Id.* at 258-259.

[25] *Id.*

[26] See *id.* at 253.

b. APPLICATION

The charter of the city of Burton provides that:

[t]he Mayor shall appoint all administrative officers of the city, except the City Attorney and City Auditor. The Mayor's appointments shall be subject to approval by an affirmative vote of four or more members of the Council. The Council shall act within thirty (30) days from the date of submission upon any appointments submitted by the Mayor for approval. [Burton Charter § 4.5(g), available at <http://www.mml.org/resources/information/charter/pdf/68.pdf> (accessed June 30, 2015) [http://perma.cc/U654-49A8].]

The chief of police is among the city's administrative officers. Burton Charter § 6.1(a). Most administrative officers, including the chief of police,

shall be appointed by the Mayor subject to the approval of the Council, and shall serve at the pleasure of the Mayor for indefinte [sic] terms, except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same. [Burton Charter § 6.2(b).]

Accordingly, for the chief of police to continue his employment after a mayoral election, he must be reappointed or reaffirmed to the position by the mayor, within 30 days of the mayor's election. This reappointment mechanism effectively means that a chief of police serves a four-year term, albeit "at the pleasure of the Mayor."[27]

Here, Whitman alleges that he engaged in protected activity under the WPA—his purported whistleblowing regarding the city's initial refusal to compensate him for unused sick leave—during the course of his four-

---

[27] Mayoral elections take place every four years. Burton Charter § 4.2(b).

year appointment as police chief. He says that the
mayor retaliated against him for this whistleblowing,
in violation of the WPA, *when the mayor declined to
reappoint him as police chief after the mayor's reelec-
tion in November 2007.*

Under the express holding of *Wurtz,* Whitman may
not bring a claim under the WPA.[28] Like Wurtz, Whit-
man alleges that defendants violated the WPA *after* the
conclusion of his employment—i.e., after the conclu-
sion of his four-year appointment as police chief.[29] He
*does not* claim that he was "subject to a specific adverse
employment action enumerated by the WPA" *during the
course of his employment.*[30] As a candidate for reappoint-
ment to the office of police chief, Whitman was essen-
tially a job applicant. His suit is premised on an alleged
WPA violation committed by defendants *after* the termi-
nation of his four-year term as police chief.

Accordingly, Whitman, as a political appointee seek-
ing reappointment, was not subject to the protections
of the WPA at the time of the alleged WPA violation.
Thus, his suit under the WPA has no merit. We
therefore reverse the trial court's denial of defendants'
request for JNOV.

### 2. PLAINTIFF DID NOT OBJECTIVELY ADVANCE
### THE PUBLIC INTEREST

Whitman is not entitled to protection under the
WPA for an additional reason: his conduct, as an

---

[28] *Wurtz,* 495 Mich at 252.

[29] As discussed in note 19 of this opinion, we recognize that if the
mayor had terminated Whitman for whistleblowing activity *during* the
course of Whitman's four-year term as police chief, Whitman's WPA
claim might be valid. The reason Whitman's claim is not valid is because
he alleges a WPA violation committed by defendants *after* the conclusion
of his four-year term.

[30] *Wurtz,* 495 Mich at 252 n 16.

objective matter, did not advance the public interest.[31] Because the WPA protects those who protect the public interest by blowing the whistle on illegality, and because laws in general are an expression of public policy for the benefit of the public, there is typically no question that reporting a violation of law advances the public interest. But this is not always true, and is certainly not true here.

In this case, Whitman's actions are unquestionably and objectively contrary to the public interest. That is, regardless of his personal motivation, Whitman's whistleblowing effort sought enforcement of a law that harmed, not advanced, the public interest.

---

[31] The Michigan Supreme Court did not address this aspect of the WPA in its 2013 opinion, nor did it do so in its 2014 order. Our understanding of the Supreme Court's statement that Whitman "engaged in conduct protected under the WPA," *Whitman II*, 493 Mich at 320, is that this protection is predicated on a narrow reading of the WPA—namely, one that only analyzes the relevancy of a plaintiff's personal motivations for "blowing the whistle." Our 2011 opinion, reversed by our Supreme Court, only addressed this discrete aspect of the WPA.

Because we did not analyze the overarching issue in our 2011 opinion—that is, whether the WPA only protects conduct that *objectively* advances the public interest—the Supreme Court did not address that issue in its 2013 decision. Because the Supreme Court instructed us in its 2013 remand to consider "all remaining issues on which [we] did not formally rule," we discussed this aspect of the WPA in the opinion issued, and vacated, in 2014, and do so again here. *Id.* at 321.

In any event, our Court has noted the distinction between an employee's personal motives in reporting legal violations and reporting that actually advanced the public interest. See *Phinney v Perlmutter*, 222 Mich App 513, 554; 564 NW2d 532 (1997) ("In addition, whether plaintiff sought personal gain in making her reports, rather than the public good, is legally irrelevant and need not be addressed *except to note that the reporting of misconduct in an agency receiving public money is in the public interest.*") (emphasis added). *Phinney*'s holding on an unrelated matter was abrogated by *Garg*, 472 Mich at 290. (*Garg* overruled *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505; 398 NW2d 368 (1986), on which *Phinney* relied for its analysis of the continuing violations doctrine.)

The law in question, Burton Ordinance 68-25C, § 8(I) ("68-C"), is not a law that protects the public interest. Rather, it is an ordinance that reads much like a standard, garden-variety collective-bargaining provision for wages and benefits.[32] It is simply a recitation that sets forth the wages and benefits for administrative, nonunionized employees of the city of Burton. In many workplaces, an employee must use sick days or vacation days, or lose them. But under some collective-bargaining agreements and employment policies, employees may accumulate these days and then get paid for all days not used. This perk is generally found in collective-bargaining agreements for unionized employees. But here, this benefit—along with a statement of wages and matters like dental insurance—was codified in 68-C.

The waiver of the benefit contained in 68-C, which plaintiff characterizes as a violation of law, has its origins in a severe financial crisis that afflicted the city of Burton in the early 2000s.[33] During this time period, the city's department heads—who obviously benefited from 68-C—voted as a group not only to take a wage freeze, but to forgo the perk of payment for accumulated leave time to avoid harmful layoffs and reduced services to the public.[34] In other words, the administrative team's waiver of the perk contained in the ordinance was an illustration of shared sacrifice by the

---

[32] See Burton Ordinance 68-25C, § 8(I) ("68-C"). As noted by the Supreme Court, "Burton's ordinance numbering and policy regarding unused leave time have changed since the time of the trial of this case." *Whitman II*, 493 Mich at 306 n 3. We agree with the Supreme Court: "[b]ecause those changes are not relevant to our analysis, this opinion refers to the ordinance numbering and language as it was introduced during trial." *Id.*

[33] *Whitman I*, 293 Mich App at 224.

[34] See *Whitman II*, 493 Mich at 307.

nonunionized department heads to advance the public interest of the citizens of the city of Burton at the employees' expense.

Only one department head objected to this public-spirited waiver of the perk—Whitman, then the chief of police.[35] He demanded his money as set forth in the ordinance,[36] which he received after the mayor acted on the advice of outside legal counsel. This is the "law" plaintiff (mis)uses to assert a claim under the WPA.

We say "misuses" advisedly because the WPA is designed to ferret out violations of law that injure the public, especially when applied to public-sector defendants.[37] If government officials, who are bound to serve the public, violate laws designed to protect the public from corruption, pollution, and the like, then employees who, at their own risk, blow the whistle on such illegality, necessarily serve the public interest. This is precisely why the WPA grants such employees protection from reprisal. The law in question here was not a law to protect the public, but rather was a simple listing of wages, benefits, and various perks. The very

---

[35] *Id.* at 307. It appears that Whitman attended the March 2003 meeting when the department heads decided to waive 68-C, but it is unclear whether Whitman voiced an opinion on the waiver at the meeting.

[36] *Id.*

[37] "The [WPA] encourages employees to assist in law enforcement . . . with an eye toward promoting public health and safety. *The underlying purpose of the [WPA] is protection of the public.* The [WPA] meets this objective by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law. Without employees who are willing to risk adverse employment consequences as a result of whistleblowing activities, the public would remain unaware of large-scale and potentially dangerous abuses." *Dolan v Continental Airlines/Continental Express*, 454 Mich 373, 378-379; 563 NW2d 23 (1997) (quotation marks and citations omitted; emphasis added; alteration omitted).

public servants who benefited financially from the ordinance made a personal sacrifice and waived their right to a perk to save the public badly needed funds, and to prevent layoffs and reduced public services. Any action contrary to the waiver was contrary to the public interest. Again, the waiver of the perk set forth in the ordinance at issue advanced the public interest. Opposition to that waiver—on which Whitman bases his suit—objectively disserved the public interest.

Also, whistleblowing assumes that an employee risks retaliation for uncovering the public employer's misconduct. Here, there simply was no misconduct or illegality. The only conduct of the city employees that implicated 68-C was the department heads' decision to waive the benefit provided by the ordinance, and Whitman's refusal to honor that waiver. This is an employee's insistence, plain and simple, that he get his perk—not an uncovering of corruption or illegality. And this disagreement about the legal effects of the waiver was satisfied, in Whitman's favor, after the city sought legal counsel. Accordingly, Whitman's citation of the ordinance was not whistleblowing. It was simply a disagreement regarding the proper interpretation of the city of Burton's labor laws. That is, there was a disagreement about whether the administrative team could waive the perk provided by 68-C, and whether Whitman was bound by the group's waiver. It had nothing to do with whistleblowing whatsoever.

That is why this is not the usual case. Reporting a violation of law normally constitutes conduct in the public interest.[38] Here, to the contrary, Whitman's

---

[38] Our sister states' jurisprudence interpreting their whistleblower statutes recognize the distinction between reported legal violations that affect the public interest (which are protected) and reported legal violations that affect solely private interests (which are not protected). Though

actions—as an objective matter—were undoubtedly against the public interest. And defendants did not actually violate any law as violations of law have been traditionally understood in whistleblowing lawsuits— i.e., revealing public corruption or malfeasance. Defendants simply refused (at first) to grant Whitman a monetary perk he demanded because all managerial employees had waived that perk. Whitman may or may not have been entitled to his perk, but he most certainly is not entitled to claim the protection of the WPA when his conduct objectively served his interest, but harmed the public's.

Because he was not a whistleblower under the WPA, no juror could have legally found in favor of Whitman on his WPA retaliation claim. The trial court's denial of defendants' request for JNOV is accordingly reversed.

### B. CAUSATION[39]

We also held in our 2011 opinion, *Whitman I*, that

---

the following cases involve internal corporate disputes—as opposed to reported violations of municipal statutes—we think that the reasoning is equally relevant to this case, where the ordinance violated did not advance the public interest. See *Garrity v Overland Sheepskin Co of Taos*, 917 P2d 1382, 1387 (NM, 1996) (noting that "[w]hen an employee is discharged for whistleblowing, the employee must also demonstrate that his or her actions furthered the public interest rather than served primarily a private interest"); and *Darrow v Integris Health, Inc*, 176 P3d 1204, 1214 (Okla, 2008) (concluding that "to distinguish whistle-blowing claims that would support a viable common-law tort claim from those that would not, the public policy breached must truly impact public rather than the employer's private or simply proprietary interests"). Cases from foreign jurisdictions are not binding, but can be persuasive authority. *People v Campbell*, 289 Mich App 533, 535; 798 NW2d 514 (2010).

[39] To prevail under the WPA, Whitman must "establish a causal connection between [the] protected conduct and the adverse employment decision by demonstrating that his employer took adverse employment action *because of* his protected activity." *Whitman II*, 493 Mich at 320. In the absence of direct evidence of retaliation (which Whitman

Whitman's alleged whistleblowing activity from late
2003 to early 2004 was not the legal cause of the
mayor's decision to not reappoint him as police chief in
late 2007.[40] On closer examination of the facts perti-
nent to the causation issue, we are even more con-
vinced that Whitman's alleged whistleblowing activity
lacks a causal link to the mayor's decision. We so hold
for several reasons.

### 1. TRUST, NOT WHISTLEBLOWING

As noted, in 2003, the mayor's administrative team
voted to voluntarily take a wage freeze and forgo the
perk of accumulated sick days to save the taxpayers
money, and to avoid layoffs and reduced services.[41] This

---

does not present), he must show indirect evidence to demonstrate "that
a causal link exists between the whistleblowing act and the employer's
adverse employment action." *Debano-Griffin v Lake Co*, 493 Mich 167,
176; 828 NW2d 634 (2013). A plaintiff's presentation of indirect evidence
is analyzed under "the burden-shifting framework set forth in *McDonnell
Douglas* [*Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)]."
*Id*. Applying this standard to retaliation claims, a plaintiff must show
that his "protected activity" under the WPA was "one of the reasons *which
made a difference* in determining whether or not to [discharge] the
plaintiff." *Matras v Amoco Oil Co*, 424 Mich 675, 682; 385 NW2d 586
(1986) (quotation marks and citations omitted; emphasis added; altera-
tion in original). In other words, "[t]o establish causation, the plaintiff
must show that his participation in [a protected activity] was a significant
factor in the employer's adverse employment action, not just that there
was a causal link between the two." *Rymal v Baergen*, 262 Mich App 274,
303; 686 NW2d 241 (2004) (quotation marks and citations omitted).
Because *Debano-Griffin* uses the *McDonnell Douglas* framework, which
was originally designed for employment discrimination claims, it is
appropriate for the Court to use federal cases interpreting *McDonnell
Douglas* as persuasive authority. See *Radtke v Everett*, 442 Mich 368, 382;
501 NW2d 155 (1993) (stating that Michigan courts may "turn to federal
precedent for guidance in reaching [a] decision" about whether a plaintiff
has established a valid discrimination claim).

[40] *Whitman I*, 293 Mich App at 232 n 1.

[41] *Id*. at 230.

sacrifice spoke well of the mayor and his department heads. Whitman's refusal to abide by the department heads' agreement and subject himself to the same sacrifice raised issues of trust and caused the mayor to rightly be disappointed in Whitman. Indeed, Whitman's "evidence" of a causal connection between his whistleblowing and the mayor's decision many years later to not reappoint him, frames the issue in exactly this context.

A third party who attended Whitman's June 2004 meeting with the mayor made handwritten notes of the discussion, which state: "Mayor = No Trust—68-C (vacation)—lack of communication[.]"[42] And the mayor's alleged December 2007 statement to other senior police officers that he and Whitman "got off on the wrong foot"[43]—a statement that, if made, occurred *after* the mayor decided not to reappoint Whitman[44]— supposedly emphasized Whitman's 68-C complaints as an issue of trust, in that his failure to adhere to a voluntary agreement with his colleagues betrayed that trust. In sum, it appears the mayor viewed the 68-C issue not in the context of whistleblowing, or anger at Whitman's supposed whistleblowing, but instead as an example of how Whitman was untrustworthy. As noted, this is not a case where a "violation of law" was even remotely an issue. And it is extremely unlikely that this "lack of trust" over Whitman's failure to honor an agreement on this specific occasion had anything to do with his subsequent dismissal, for the numerous reasons discussed below.

---

[42] *Whitman II*, 493 Mich at 309 (quotation marks omitted; alteration in original).

[43] *Id.*

[44] It is difficult to see how a statement the mayor allegedly made *after* he had already declined to reappoint Whitman could influence his decision not to reappoint Whitman.

### 2. ALLEGED RETALIATION IS TEMPORALLY REMOTE FROM ALLEGED WHISTLEBLOWING

Whitman's claim has a serious temporal problem: he alleges that he was not reappointed in late 2007 for events that took place in late 2003 and early 2004. Our courts have taken pains to stress that the length of time between an alleged whistleblowing and an adverse employment action is not dispositive on the issue of retaliation—when those two events are *close in time* (i.e., days, weeks, or a few months apart).[45] If whistleblowing and retaliation that occur close in time may not be sufficient to find causation under the WPA, then whistleblowing and retaliation that occur *far apart* in time certainly weigh against finding causation. See *Fuhr v Hazel Park Sch Dist*, 710 F3d 668, 675-676 (CA 6, 2013) (holding that in the context of a Title VII retaliation claim, a two-year gap between a plaintiff's protected activity and the claimed retaliatory act "proves fatal to [the plaintiff's] assertion that there is a causal connection").[46]

---

[45] See, for example, *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003) (holding that to satisfy the causation requirement under the WPA, a plaintiff "must show something more than merely a coincidence in time between protected activity and adverse employment action"); *Tuttle v Metro Gov't of Nashville*, 474 F3d 307, 321 (CA 6, 2007) (stating that "[t]he law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim"); and *Shaw v City of Ecorse*, 283 Mich App 1, 15; 770 NW2d 31 (2009) (noting that "[a] temporal connection between protected activity and an adverse employment action does not, in and of itself, establish a causal connection").

[46] In its opinion, the United States Court of Appeals for the Sixth Circuit noted that "[o]ur review of the law shows that multiyear gaps between the protected conduct and the first retaliatory act have been insufficient to establish the requisite causal connection." *Fuhr*, 710 F3d at 676. This observation is correct; courts interpreting our sister states' whistleblower laws and jurisprudence have made similar observations. A long time span between the alleged whistleblowing and supposed retali-

Here, there is an enormous temporal gap between Whitman's alleged whistleblowing and the supposed retaliation, which belies any causal connection between the two. As noted, Whitman's demands to receive compensation under 68-C took place in 2003 and early 2004. The mayor declined to reappoint him as police chief in November 2007—almost four years after the supposed whistleblowing. Of course, the mayor, as the top executive officer of the city of Burton, *could have terminated Whitman at any time.*[47] He could have done so in March 2003, when Whitman first voiced opposition to the waiver of 68-C, or in early 2004, when he insisted on his compensation under the ordinance. In fact, the evidence demonstrates that the mayor was not concerned about Whitman's 68-C demands at all, because he reappointed him as police chief in November 2003—six months after Whitman's initial complaint regarding 68-C. And again, Whitman's term expired in November 2007, almost *four years* after those complaints.

It strains credulity to the breaking point to suggest, as Whitman does, that the mayor—who had the power to dismiss Whitman at any time, for any reason or no reason—was so upset with his alleged whistleblowing in late 2003 and early 2004 but allowed Whitman to continue as police chief for all of 2004, 2005, 2006, and into late 2007, and only then decided to "retaliate" against him. Indeed, when viewed in the context of the

ation weighs against finding causation. See *Blake v United American Ins Co*, 37 F Supp 2d 997, 1002 (SD Ohio, 1998) (holding that alleged whistleblowing action that took place five years before plaintiff's termination was not "close enough in time . . . to support a claim of retaliation"); *Anderson v Meyer Broadcasting Co*, 630 NW2d 46, 55 (ND, 2001) (holding that a "lengthy" delay of approximately a year "between [plaintiff's] reports and her termination does not support an inference she was fired because of the protected activity").

[47] Again, Burton Charter § 6.2(b) states that the chief of police serves "at the pleasure of the mayor."

typically close working relationship between a mayor and his chief of police, and the fact that the chief of police, as a member of the mayor's executive team, serves at the *pleasure of the mayor*, Whitman's allegations take leave of reality and enter the theatre of the absurd.

### 3. BREAKS IN WHITMAN'S SUPPOSED CAUSAL CHAIN

The long period of time between Whitman's supposed whistleblowing and the mayor's decision not to reappoint him involves another aspect that is fatal to his claim: there are numerous breaks in the causal chain. Whitman's first complaints regarding the administrative team's waiver of 68-C in March 2003 clearly did not cause the mayor to retaliate. Indeed, the mayor reappointed Whitman as the chief of police in November of that same year. Whitman's further attempts to secure compensation in January 2004 were addressed by the mayor, who first sought the advice of city counsel, and later, outside labor counsel. The mayor complied with that legal advice by paying Whitman almost $7,000 in additional compensation. And Whitman's 2004 dispute with the mayor ended amicably—he remained chief for more than three years following that meeting, and by his own admission, he never heard mention of the 68-C dispute from the mayor and never was retaliated against during that time period. These intervening events—all positive developments for Whitman—raise serious doubts that his 68-C whistleblowing was a "determining factor" or "caus[e] in fact" of the mayor's decision to not reappoint him. *Matras*, 424 Mich at 682.

### 4. WHITMAN'S MISCONDUCT LED TO ADVERSE EMPLOYMENT ACTION

In any event, Whitman has provided no evidence to

refute the mayor's stated and compelling reasons for not reappointing him—Whitman engaged in serious misconduct and misused his office. After his reelection in November 2007, the mayor reevaluated his entire administrative team pursuant to the mandates of Burton Charter § 6.2(b).[48] During this period, he was advised of Whitman's serious misconduct in office by officers in Whitman's department. Among other things, these included allegations that Whitman (1) meted out inadequate discipline of subordinates who abused their power, (2) misused a city computer to exchange sexually explicit e-mail messages with a woman who was not his wife, (3) discriminated against a female officer, and (4) forged a signature on a budget memo.[49] Command officers within the police department warned the mayor of serious morale problems created by Whitman's abuse of power.[50] In the face of these troubling revelations, the mayor understandably did not reappoint Whitman to this important position of public trust, and these are the reasons the mayor gave for declining to reappoint him as police chief in November 2007. To suggest that a mayor, whose chief of police works at the mayor's pleasure, would make a reappointment decision based on an old, stale issue instead of very recent, more disturbing revelations, is simply fanciful.

---

[48] Again, Burton Charter § 6.2(b) states:

> All other administrative officers shall be appointed by the Mayor subject to the approval of the Council, and shall serve at the pleasure of the Mayor for indefinte [sic] terms, except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same.

[49] See *Whitman II*, 493 Mich at 309; *Whitman I*, 293 Mich App at 227. Whitman admitted at trial that he used a city computer to exchange sexually explicit messages with a woman who was not his wife.

[50] *Whitman I*, 293 Mich App at 227.

Whitman made no specific effort before this Court to
deny these allegations against him other than to state,
self-servingly and without support, that they were
"merely a pretext," and to assert "that his personnel
file demonstrate[d] that his performance as a police
chief was good, that he had received numerous awards,
and that there were never any disciplinary actions
against him." *Whitman II*, 493 Mich at 309-310. Whit-
man's only proffered "evidence" of a causal connection
between his supposed whistleblowing and the mayor's
decision to not reappoint him was the statement the
mayor made in December 2007—after the mayor had
already made his decision, but before its public
announcement—in which the mayor supposedly told
senior police officers that he lacked trust in Whitman.
The mayor cited as one example Whitman's refusal to
keep his word, and along with the entire administra-
tive team, to waive his unused sick-day compensation
under 68-C.

Whitman's assertion must be weighed against the
other factors in this case: (1) the mayor's view of
Whitman's 68-C demands as a trust issue, not a
retaliation issue, and certainly not whistleblowing, (2)
the almost four-year interval between Whitman's al-
leged whistleblowing and the purported retaliation, (3)
the causal breaks in Whitman's claim, and (4) the
allegations of Whitman's extensive misconduct. When
Whitman's assertion is weighed against these factors,
the evidence is overwhelming that his so-called
whistleblowing had no connection to the mayor's deci-
sion to not reappoint him as the police chief. There is
simply no way that a reasonable fact-finder, even when
"view[ing] the evidence and all legitimate infer-
ences . . . in the light most favorable to the nonmoving
party," *Genna*, 286 Mich at 417, could find that retali-
ation was "one of the reasons *which made a difference*

in determining whether or not to [discharge] the plaintiff." *Matras*, 424 Mich at 682 (emphasis added; alteration in original).

### IV. REPLY TO THE DISSENT

The dissent's analysis betrays a basic misunderstanding of the nature and function of executive appointments in governmental administration. Again, the mayor of the city of Burton is required by the city charter to "reaffirm or appoint . . . administrative officers" to the city administration "within thirty (30) days from his election." Burton Charter § 6.2(b). The city council is then required to confirm or deny the appointments "within thirty (30) days from the date of submission . . . ." Burton Charter § 4.5(g). Because the mayor is elected every four years, he is required by the city charter to reaffirm or appoint the city's administrative officers every four years. Within that four-year span, the mayor may dismiss an administrative officer at any time. Burton Charter § 6.2(b). As a result, an administrative officer in the city of Burton has no expectation of continued employment. An administrative officer knows that his term cannot last longer than four years, because after the mayor's election or reelection, an administrative officer must be reaffirmed to his position. And an administrative officer also knows that his term may be *much shorter* than four years—indeed, it may be ended at any time—because an administrative officer serves "at the pleasure of the mayor."

Here, as we have explained in our opinion, *Wurtz* mandates that Whitman's suit be dismissed. The mayor was reelected in November 2007. Upon the mayor's reelection, Whitman's term as police chief, which began in 2003, effectively ended. The city char-

ter required the mayor to reaffirm or appoint a police chief and to submit his suggestion to the city council for approval. Thus, at that stage, Whitman was merely a *candidate* for the position of police chief. Accordingly, Whitman cannot now use the WPA to sue the city for the mayor's ultimate decision to not reappoint him as police chief, because the WPA does not protect job applicants or prospective employees. In other words, Whitman may not bring a WPA claim against the city of Burton for the mayor's decision to not reappoint him to an office that, as a matter of law, he no longer held at the time.

The dissent attempts to escape this obvious outcome with irrelevant appeals to emotion ("[Whitman] was a full-time, 32½-year employee with the city of Burton"), misstatements of fact ("Smiley removed [Whitman] . . . on November 27, 2007"), and basic misinterpretations of key terms ("[Whitman] enjoyed an 'indefinite' term of employment [as chief of police]").

The last of these is particularly egregious. The true, noncolloquial, definition of "indefinite" is "not definite"—i.e., "having no exact limits." *Merriam-Webster's Collegiate Dictionary* (2014). This is exactly the way in which the word is used in the city of Burton's city charter:

> All other administrative officers shall be appointed by the Mayor subject to the approval of the Council, and *shall serve at the pleasure of the Mayor for indefinte* [sic] *terms,* except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same. [Burton Charter § 6.2(b) (emphasis added).]

Instead of using the correct dictionary definition of "indefinite" and adhering to the broader context of the

sentence in which the word is used in the city of Burton's charter, the dissent interprets "indefinite" to mean "forever"—i.e., that Whitman had an expectation of continued employment for an unlimited period of time.

This interpretation is the *exact opposite* of what the word "indefinite" actually means in the context of the city charter. Again, an "indefinite" term of employment is one that is "not definite"—i.e., *one that can end at any time*—today, tomorrow, or any time before the conclusion of the four-year term. Accordingly, the city charter's use of "indefinite" means that while a police chief may be employed for a full four-year term, he serves at the pleasure of the mayor and may be terminated *at any time before* the expiration of the four-year term. Therefore, Whitman had no basis for his expectation of continued employment. But most important to the application of *Wurtz*, the law of the city of Burton required Whitman to be reappointed (and approved by the city council) as the chief of police *every four years*, after the mayor's reelection. Because the mayor chose not to reappoint Whitman as police chief *after* his term as police chief had expired, Whitman has no recourse under the WPA.

Finally, the dissent attempts to confuse matters by insinuating that we do not recognize that at-will employees are protected under the WPA. Of course we recognize the obvious proposition that an at-will employee, like any other employee, is protected under the WPA—*for retaliatory actions taken against him when he is employed*. Here, defendants never took retaliatory action against Whitman while he was employed as chief of police. Rather, the mayor chose to not reappoint Whitman *after* the mayor's reelection in Novem-

ber 2007, at which time Whitman became a candidate for the (then open) position of police chief.

### V. CONCLUSION

We hold that Whitman's claim must be dismissed for any one or a combination of the following reasons: (1) *Wurtz* requires its dismissal, (2) objectively, Whitman's conduct did not advance the public interest, but instead ran contrary to the public interest, and (3) the mayor's refusal to reappoint Whitman, a political appointee, to another four-year term as police chief, was a result of Whitman's egregious misconduct, not the alleged whistleblowing activity that took place long before his four-year term as chief had ended.

Accordingly, because no reasonable fact-finder could legally find in favor of Whitman on his claim under the WPA, we reverse the trial court's denial of defendants' motion for JNOV and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

O'CONNELL, P.J., concurred with SAAD, J.

BECKERING, J. (*dissenting*). As noted by the majority, this matter is before the Court for a third time. Once again, I must disagree with the majority opinion. In addition to my conclusion that *Wurtz v Beecher Metro Dist*, 495 Mich 242; 848 NW2d 121 (2014), does not impact the outcome of this case, I disagree with the majority's analysis regarding the requirements of the Whistleblowers' Protection Act (WPA), MCL 15.361 *et seq.*, and the majority's attempt to engraft language that does not exist into the act. In its first opinion in

this case, the majority held that "a critical inquiry" in determining the validity of a claim under the WPA "is whether the employee acted in good faith and with a desire to inform the public on matters of public concern . . . ." *Whitman v City of Burton*, 293 Mich App 220, 230; 810 NW2d 71 (2011) (*Whitman I*) (quotation marks and citations omitted). As the Michigan Supreme Court noted at the time of its first remand in this matter, "[n]othing in the statutory language of the WPA addresses the employee's motivation for engaging in protected conduct, nor does any language in the act mandate that the employee's *primary* motivation be a desire to inform the public of matters of public concern." *Whitman v City of Burton*, 493 Mich 303, 306; 831 NW2d 223 (2013) (*Whitman II*).[1] Yet the majority continues to focus on plaintiff Bruce Whitman's motivations, going so far as to call him "selfish." Perhaps it is to justify its decision to engraft into the plain language of the WPA another requirement: in addition to a plaintiff's duty to prove that he reported, or was about to report, a "violation or a suspected violation of a law or regulation or rule," the plaintiff must take the additional step of proving that the law or regulation or rule at issue is one that is deemed to "advance the public interest." Markedly absent from MCL 15.362 is

---

[1] The Supreme Court further noted that "the plain language of MCL 15.362 controls, and we clarify that a plaintiff's motivation is not relevant to the issue whether a plaintiff has engaged in protected activity and that proof of primary motivation is not a prerequisite to bringing a claim. To the extent that *Shallal* [*v Catholic Social Servs of Wayne Co*, 455 Mich 604; 566 NW2d 571 (1997)] has been interpreted to mandate those requirements, it is disavowed." *Whitman II*, 493 Mich at 306. See also *id.* at 313, 318-319, 321. As the Supreme Court pointed out in its opinion, *id.* at 314-319, and as I addressed in my dissenting opinion in *Whitman I*, 293 Mich App at 232-250 (BECKERING, J., dissenting), *Shallal* and related caselaw focused on *causation* and the failure to establish a causal connection between a plaintiff's firing and the protected activity.

any requirement that a court or jury determine whether the law at issue actually advances the public interest, or whether "the plaintiff's conduct objectively promoted the public interest." Because I cannot countenance an attempt to judicially impose a requirement into the WPA where no statutory basis exists, especially a requirement that appears to be nothing more than an attempt to get around our Supreme Court's last prohibition against using the plaintiff's motives as a factor to determine whether he or she has engaged in protected conduct, I dissent.[2] See *Whitman II*, 493 Mich at 319.

The primary purpose of the Supreme Court's latest remand order in this case, *Whitman v City of Burton*, 497 Mich 896 (2014) (*Whitman IV*), was to enable this Court to determine whether *Wurtz* impacts the outcome. In *Wurtz*, 495 Mich at 244, our Supreme Court evaluated whether the WPA applies to a fixed-term contract employee "whose term of employment has expired without being subject to a specific adverse employment action identified in the WPA and who seeks reengagement for a new term of employment . . . ." Noting that such an employee "occupies the same legal position as a prospective employee," and that "[t]he WPA, by its express language, only applies to current employees" and "offers no protection to prospective employees," the Court concluded that the

---

[2] As noted by the Supreme Court in *Whitman II*, 493 Mich at 313, "[t]o do so would violate the fundamental rule of statutory construction that precludes judicial construction or interpretation where, as here, the statute is clear and unambiguous." The fact that the majority's new requirement of "advanc[ing] the public interest" is seen nowhere else in the caselaw, from what I could ascertain, further supports the conclusion that the majority is overstepping its bounds. As the Supreme Court noted, the plain and unambiguous language of the WPA, *as is*, "meets its objective of protecting the public . . . ." *Id.* at 318.

WPA had no application. *Id*. The Supreme Court made clear, however, that its ruling did not affect the rights of at-will employees and others who enjoy an expectation of ongoing employment and an expectation that they will not be fired or otherwise discriminated against for reasons violative of the WPA. *Id*. at 256-257. It further clarified that its ruling did not address contracts with a "renewal clause imposing some obligation or duty on the employer to act." *Id*. at 258 n 32.

I respectfully dissent from the ruling of my colleagues because I would find that Whitman's employment situation was considerably different from, and distinguishable from, that of the plaintiff in *Wurtz*, and that Whitman was protected by the WPA. Unlike the plaintiff in *Wurtz*, Whitman was not a fixed-term employee whose contract was allowed to expire in accordance with the terms of the agreement. Instead, he was a full-time, 32½-year employee with the city of Burton who enjoyed an "indefinite" term of employment, much like any other at-will employee protected by the WPA, and who was not reaffirmed in his position as the chief of police because, according to the evidence and the jury's conclusion at trial, the mayor retaliated against him due to his whistleblowing activities. As such, I remain with my findings and conclusions on all pertinent appellate issues in this case as set forth in my prior dissents, *Whitman I*, 293 Mich App 220, and *Whitman v City of Burton*, 305 Mich App 16; 850 NW2d 621 (2014) (Whitman III).

## I. *WURTZ*

In *Wurtz*, the plaintiff, Richard Wurtz, entered into a fixed-term employment contract with the Beecher Metropolitan District, which manages water and sewage for a portion of Genesee County. *Wurtz*, 495 Mich at 244-245. Wurtz contracted to serve a 10-year term as the

district administrator; he drafted the contract himself
because he was serving as the district's attorney at the
time he entered into the agreement. *Id.* at 245. Per the
terms of the contract, Wurtz served from February 1,
2000, to February 1, 2010. *Id.* Notably, the contract did
not contain an extension or renewal clause. *Id.* at 248.
Wurtz's relationship with the board members soured
and became "tumultuous" in the two years before his
contract expired, which he claimed was due in part to
his whistleblowing activities. *Id.* at 245-247. As his fixed
term neared its expiration, Wurtz solicited the board to
extend his contract, and he warned the board members
that if they did not extend his contract beyond the
10-year period as he wished, he would consider their
failure to do so retaliation under the WPA for actions he
took against them during his tenure. *Id.* at 246-247. The
board voted not to extend Wurtz's contract, and instead,
allowed it to expire per the terms of the contract. *Id.* at
247. As the Supreme Court emphasized in its opinion,
"[o]ne essential and undisputed fact bears emphasis:
Wurtz suffered no adverse consequences in the context
of his self-drafted 10-year contract." *Id.* He finished his
term of employment with no change in his employment
status. After the contract expired, Wurtz sued the dis-
trict and three of its board members "alleging a viola-
tion of the WPA and wrongful termination in violation of
public policy." *Id.* The trial court granted the district's
motion for summary disposition, and this Court re-
versed in a split decision. *Id.* at 248.

The Supreme Court granted leave to appeal and
framed one of the legal issues in dispute as "whether the
plaintiff suffered an adverse employment action under
the Whistleblower Protection Act (WPA), MCL 15.361 *et
seq.*, when the defendants declined to renew or extend
the plaintiff's employment contract, *which did not con-
tain a renewal clause beyond the expiration of its ten*

*year term*[.]" *Wurtz v Beecher Metro Dist*, 494 Mich 862 (2013) (emphasis added). In its analysis, the Supreme Court concluded that "a contract employee seeking a new term of employment should be treated the same as a prospective employee for purposes of the WPA." *Wurtz*, 495 Mich at 249. Thus, "[t]he question then becomes whether a spurned job applicant can bring a claim under the WPA." *Id*. The Court held that "the WPA, by its express language, has no application in the hiring context. Thus, the WPA does not apply when an employer declines to renew a contract employee's contract." *Id*. The Court held that in the context of the *Wurtz* case, "no relevant difference exists between a new job applicant and a current contract employee seeking a new term of employment." *Id*. at 250. Although the Court held that the WPA did not apply to the plaintiff's request for renewal of his contract in *Wurtz*, it expressly noted that the contract at issue did not contain a renewal clause and left open the issue whether such a clause would have an effect on its analysis. *Id*. at 258 n 32 ("Wurtz's contract *did not contain any renewal clause imposing some obligation or duty on the employer to act.* Thus, we need not address the effect that such a clause would have on our analysis.") (emphasis added).

The relevant provision of the WPA, MCL 15.362, states as follows:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a

public body to participate in an investigation, hearing, or
inquiry held by that public body, or a court action.

Our Supreme Court noted that the WPA "only applies
to individuals who currently have the status of an
'employee,'" *Wurtz*, 495 Mich at 252, and because Wurtz
made "no claim that his employment contract was in
any way breached or that he was subject to a specific
adverse employment action enumerated by the WPA
during his contract term," his claim was not covered by
the WPA. *Id.* at 252 n 16. The Court noted that "[w]hile
the ADEA[3] and Title VII[4] may apply in the context of
a contract renewal, that fact has no bearing on the
application of the WPA." *Id.* at 255. As to why the WPA
only covers current employees and not prospective
employees, our Supreme Court noted, "[t]his Court
need not inquire why the Legislature chose to *confine
the WPA's protections by the bookends of employment*
while extending the [Civil Rights Act's] protections to
the hiring context. The Legislature elected to craft its
legislation that way, and we decline to second-guess
the wisdom of the Legislature's policy decisions." *Id.* at
255 (emphasis added).

Our Supreme Court emphasized, however, the lim-
ited nature of its holding and made clear that the WPA
"does protect" against prohibited employer actions
both at-will employees, who "stand[] squarely within
the WPA's protections," and employees working under
fixed-term contracts with respect to an employee's
service under such a contract. *Id.* at 256-257.

## II. APPLICATION OF *WURTZ* TO WHITMAN

That brings us to the present case. Whitman testi-

---

[3] Age Discrimination in Employment Act, 29 USC 623(a)(1).

[4] Title VII of the federal Civil Rights Act, 42 USC 2000e-2(a)(1).

fied at trial that he was first hired by the city of Burton as a civilian police aide in June 1975. He attended the Flint Police Academy, and the city of Burton hired him as a paid reserve officer. He then became a part-time officer, and in 1978, he became a full-time officer. After working full-time as a patrolman, he was promoted to sergeant in 1991. In 1998, he was promoted to lieutenant. In December 2001, defendant Charles Smiley, the mayor at the time, appointed Whitman to serve as the interim police chief, and in March 2002, he promoted Whitman to the position of chief of police, which Whitman held until Smiley removed him from that post on November 27, 2007.[5]

### A. PERTINENT CHARTER PROVISIONS DEFINING WHITMAN'S EMPLOYMENT RELATIONSHIP

Smiley testified that pursuant to the city charter, within 30 days of a mayor's election, the mayor must submit the names of "the clerk, the fire chief, the police chief, the assessor, [and] the treasurer . . . to the City Council" to be confirmed by the council. In this regard, the city charter provides that city administrative officers are "the Mayor, the Clerk, the Treasurer, the Attorney, the Assessor, the Chief of Police, the Fire Chief, and a Board of Review." Burton Charter § 6.1(a).

---

[5] Smiley, who was first elected mayor in 1991, testified that after the previous police chief retired in 2002, he formed a search committee and ultimately selected Whitman from among the top two or three candidates "because he was a Burton officer. I really thought we should promote within." After Smiley was reelected in 2003, he reaffirmed Whitman as the chief of police. What was described in detail in earlier opinions of this Court need not be rehashed here. Whitman presented evidence at trial to establish that he engaged in whistleblowing activities in 2003 and 2004 that raised the ire of Smiley and almost got Whitman fired in 2004. After Smiley was reelected in November 2007, he decided not to reaffirm Whitman as the police chief. The jury concluded that this decision was motivated in part by Whitman's whistleblowing activities.

Section 6.1(*c*) provides that "[t]he terms of all administrative officers, except the Mayor, shall be *indefinite*." (Emphasis added.)

Section 6.2(b) provides that

> [a]ll other administrative officers [except the City Attorney and the City Auditor] shall be appointed by the Mayor subject to the approval of the Council, and shall serve at the pleasure of the Mayor *for indefinte* [sic] *terms*, except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same. [Emphasis added.]

### B. APPLICABILITY OF THE WPA TO WHITMAN'S EMPLOYMENT

I disagree with the majority's conclusion that this case fits so neatly into the rule established in *Wurtz*. I begin by noting the significant ways in which this case is different from *Wurtz*. The plaintiff in *Wurtz* was employed pursuant to a 10-year contract with no renewal clause. The contract contained no provisions for changing its end date or for otherwise renewing the term of Wurtz's employment. Thus, nothing required the employer to make a choice about the plaintiff's employment; the employment simply expired. The end of the plaintiff's employment relationship was a *fait accompli*. Any hope the plaintiff had of employment after the expiration of the 10-year term was in striking up a new term of employment. In this sense, given the terms of the plaintiff's employment agreement, he was nothing more than a prospective employee. As the dissenting opinion (which was ultimately embraced by the Supreme Court) pointed out when the *Wurtz* case was before this Court:

> The WPA requires the existence of an employment relationship. By plaintiff's own admission, defendants scrupu-

lously adhered to the terms of his contract. Plaintiff now seeks damages because defendants abided by the terms of his employment contract. Plaintiff's position is illogical and lacks any support in our jurisprudence. *Absent a contractual obligation or legal duty to consider an extension or renewal* of an employment contract, a cause of action under the WPA is unavailing when a contractual employee finishes a fixed-term contract. [*Wurtz v Beecher Metro Dist*, 298 Mich App 75, 91; 825 NW2d 651 (2012) (K. F. KELLY, J., dissenting), rev'd 495 Mich 242; 848 NW2d 121 (2014) (emphasis added).]

I respectfully suggest that the instant case falls squarely within the exception set forth in the dissenting opinion of our Court in *Wurtz*, and as expressly carved out by our Supreme Court when it held that the ruling in *Wurtz* dealt only with a fixed-term contract that *"did not contain a renewal clause beyond the expiration of its ten-year term." Wurtz*, 494 Mich at 862 (emphasis added). See also *Wurtz*, 495 Mich at 258 n 32. Here, in contrast to Wurtz's fixed-term contract, the city of Burton's charter contained a clause providing that the chief of police's term of employment "shall be indefinite," § 6.1(c), as well as a clause pertaining to the renewal of that "indefinte [sic] term[]," § 6.2(b). Notably, § 6.2(b) of the city of Burton's charter provided that Whitman's employment was indefinite, "except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same."[6] This is effectively a renewal clause that imposed an obligation on Mayor Smiley to make a choice about Whitman. The

---

[6] Contrary to the characterization set forth in the majority opinion, plaintiff was not appointed to "a four-year term" or a "four-year appointment" as the chief of police. Rather, it was Mayor Smiley who held a four-year term. Upon his election, the city charter tasked him with deciding whose names to submit to the City Council to serve as his

issue involved in this case was purposely not addressed in *Wurtz*. See *Wurtz*, 495 Mich at 258 n 32 ("Wurtz's contract did not contain any renewal clause imposing some obligation or duty on the employer to act. Thus, we need not address the effect that such a clause would have on our analysis.").

It is the existence of the choice, mandated by the renewal clause, that takes this case outside the ambit of *Wurtz* and brings Whitman within the protection of the WPA. Under the city of Burton's charter, Whitman's term of employment was expressly and repeatedly defined as "indefinite," and it was only to be reevaluated at the time a mayor won reelection. Like any at-will employee, Whitman could certainly be fired at any time, as he served at the pleasure of the mayor—this simply means that the mayor was delegated the authority to choose several of the city's employees who served as his or her administrative officers. In general, Whitman was, for all intents and purposes, an at-will employee, and such employees are protected by the WPA. *Wurtz*, 495 Mich at 256-257. Notably, upon a mayor's reelection, § 6.2(b) imposed an obligation or duty on the mayor to act and to make a decision about his administrative officers' continued employment. Section 6.2(b) provides that the mayor "shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same." Such a decision was mandated, as evidenced by the use of the word "shall" in § 6.2(b). Burton Ordinance § 10.05(B) (defining the word "shall" to mean that "[t]he act referred to is

administrative officers; those officers served at his pleasure. After his reelection, Smiley was tasked with deciding whom to *reaffirm* in that capacity.

mandatory"). See also *Old Kent Bank v Kal Kustom Enterprises*, 255 Mich App 524, 532; 660 NW2d 384 (2003) ("The word 'shall' is generally used to designate a mandatory provision . . . ."). Therefore, unlike *Wurtz*, this case did not involve an employment relationship that was bound to expire on its own terms, which would have left plaintiff in the same position as that of a prospective employee. The terms of Whitman's employment required Smiley to make a choice about the direction in which the employment relationship would go.

Although police chiefs often serve at the pleasure of their mayor, it is also true that police officers often attain such a position after years of service in law enforcement, and it becomes the capstone of their careers. Many serve for one or more decades in the position and retire from it at the end of their careers. To be sure, Whitman was not entitled to serve as long as he wished in the role of chief of police. He could be fired at any time and for any reason that did not violate the law. But given the language of the city of Burton's charter, I would hold that Whitman was serving within the bookends of his employment and that the WPA protected him from being fired or not reaffirmed by Smiley based on any discriminatory reasons. To interpret the applicability of the WPA as the majority suggests, in addition to being incorrect in my opinion, would potentially compromise the role of the chief of police, as the police chief could jeopardize his or her employment if he or she did not follow the mandates of the mayor, which might cause the police chief to ignore a violation of a law or regulation or rule so as to not risk being fired. That cannot be what the enactors of the WPA intended.

Because Whitman held an indefinite term of employment that carried with it the express option of being

continued by reaffirmation, I find that any decision to terminate that employment, if motivated by protected activity, was a violation of the WPA. "The underlying purpose of the WPA is protection of the public. *The statute meets this objective by protecting the whistleblowing employee* and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law." *Pace v Edel-Harrelson,* 309 Mich App 256, 264; 870 NW2d 745 (2015) (quotation marks and citations omitted; emphasis added). In light of the purpose of the WPA, I decline to adopt the majority's narrow reading of the act, which would allow an employer to discriminate against an employee whose term of employment is expressly subject to a renewal clause, yet face no consequences under the WPA for taking a discriminatory action.[7] Where the terms of employment require consideration of renewal, I cannot interpret the WPA as countenancing willful discrimination against an employee for whistleblowing activities at the time the employer makes a decision on the employee's renewal clause. Indeed, the WPA is a remedial statute that is to be liberally construed. See *id.* Allowing an employer who is mandated to make a choice about a current employee to discriminate against that employee because he or she engaged in protected whistleblowing activities would, in my mind, strike a damaging blow to the WPA.

III. ADOPTION OF THE ANALYSIS IN MY PRIOR DISSENTS

In light of the Supreme Court's opinion in *Whitman II,* 493 Mich 303, and its decision to "vacate the

---

[7] This is not to imply that a renewal clause offers an at-will employee such as Whitman any greater protections than those of any other at-will employee. Rather, I would simply hold that the choice an employer makes about a renewal clause is within the bookends of the at-will employee's employment.

judgment of the Court of Appeals" following the first remand, and to remand the case for a second time to consider the impact of *Wurtz*, *Whitman IV*, 497 Mich at 896, the slate has been wiped clean of this Court's earlier binding opinions. The majority duly fulfills its obligation to reconsider this case in light of *Wurtz*. But in addition, the majority readopts nearly verbatim its earlier analysis after the first remand in this case, *Whitman III*, 305 Mich App at 22-33. As noted in the introductory paragraph of this dissenting opinion, I take issue with the majority's attempt to engraft a requirement into MCL 15.362 that does not exist. MCL 15.362 provides that

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, *a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body*, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action. [Emphasis added.]

Nothing in the plain language of the statute requires a court or a jury to decide as a matter of fact whether the law or regulation or rule objectively advances the public interest. No qualitative analysis is required to decide which law or regulation or rule is worthy of being covered by the WPA. The plain language of MCL 15.362 does not remotely suggest that some laws are included and others are not. As the Supreme Court pointed out in *Whitman II*, 493 Mich at 311-312:

When interpreting a statute, we follow the established rules of statutory construction, the foremost of which is to discern and give effect to the intent of the Legislature. To do so, we begin by examining the most reliable evidence of that intent, the language of the statute itself. If the language of a statute is clear and unambiguous, the statute must be enforced as written and no further judicial construction is permitted. Effect should be given to every phrase, clause, and word in the statute and, whenever possible, no word should be treated as surplusage or rendered nugatory. Only when an ambiguity exists in the language of the statute is it proper for a court to go beyond the statutory text to ascertain legislative intent.

The plain and unambiguous language of the WPA, *as is*, "meets its objective of protecting the public," *id*. at 318, and "further judicial construction" is neither required nor permitted, *id*. at 312. The Supreme Court also admonished that "there is no 'primary motivation' or 'desire to inform the public' requirement contained within the WPA," and such a requirement cannot be judicially imposed—"[t]o do so would violate the fundamental rule of statutory construction that precludes judicial construction or interpretation where, as here, the statute is clear and unambiguous." *Whitman II*, 493 Mich at 313.

Despite the Supreme Court's explicit and repeated admonitions *not* to consider a plaintiff's motives when determining whether a plaintiff has engaged in protected activity under the WPA—because such motive is irrelevant to the issue—the majority opinion attempts to place an invisibility cloak over its effort to do just that. Imposing on MCL 15.362 a new, judicially created requirement to evaluate whether, in fact, the law or regulation or rule at issue in the WPA action actually serves the public interest, brings motive—or purpose—back into the equation. For example, the majority describes Whitman's attempt to enforce Ordinance

68-C as a "(mis)use" of the WPA. They opine that Whitman's conduct "objectively disserved the public interest," that he "objectively served his interest, but harmed the public's," and that "[t]his is an employee's insistence, plain and simple, that he get his perk . . . ." As Shakespeare noted, calling a rose, by another name does not alter what it is. The majority attempts to add the sweet fragrance of a new name to its judicially created imposition: assessing the objectives of the plaintiff and determining whether his or her actions actually advance the public interest. Nothing in the plain language of MCL 15.362 supports this additional requirement.

Even if the majority has correctly engrafted a new requirement into the language of MCL 15.362, I disagree that Whitman's actions were "unquestionably and objectively contrary to the public interest" and "harmed, not advanced, the public interest," as characterized by the majority. As I noted in my prior dissenting opinions, seeking to balance a budget through violating one of the city's own ordinances hardly seems to serve the public interest. *Whitman I*, 293 Mich App at 248 (BECKERING, J., dissenting). As the chief of police, Whitman was fulfilling his duty to uphold the law, which was certainly in the public interest. *Id.* The public interest is served when a violation of the law is reported. *Whitman III*, 305 Mich App at 46 (BECKERING, J., dissenting); see also *Dolan v Continental Airlines / Continental Express*, 454 Mich 373, 378 n 9; 563 NW2d 23 (1997). And while the city may save expenses by ignoring the requirements of Ordinance 68-C, the public will literally not be served on the days the public servants subject to the ordinance are absent from work, taking their allotted sick, personal, and vacation time in

light of the mayor's warning to "use it or lose it." *Whitman III*, 305 Mich App at 47 n 4 (BECKERING, J., dissenting).

I could, like the majority, reiterate the arguments I set forth in my prior dissenting opinions. To do so, however, would be purely repetitive, as nothing has changed the analysis. Consequently, to spare the reader the redundancy, I adopt and remain with my previous findings and conclusions on all pertinent appellate issues in this case. See *Whitman I*, 293 Mich App 220; *Whitman III*, 305 Mich App 16.

### IV. CONCLUSION

Because I conclude that *Wurtz* does not affect the outcome of this case, I would affirm the trial court's order awarding judgment to Whitman in keeping with the jury's verdict. As set forth in my prior dissents, the trial court did not err in denying defendants' motion for JNOV. See *Whitman I*, 293 Mich App at 237-239 (BECKERING, J., dissenting); *Whitman III*, 305 Mich App at 41-47 (BECKERING, J., dissenting). There was sufficient evidence of causation to create a material question of fact for the jury. See *Whitman I*, 293 Mich App at 240-242 (BECKERING, J., dissenting); *Whitman III*, 305 Mich App at 47-57 (BECKERING, J., dissenting). The trial court did not abuse its discretion in denying defendants' motion for a new trial. See *Whitman I*, 293 Mich App at 250-252 (BECKERING, J., dissenting). And the trial court did not err by concluding that Smiley is not entitled to a setoff. *Id.* at 252-253. Finally, for the reasons stated above, I strongly disagree with the majority's conclusions that Whitman did not engage in protected activity and that he was not a whistleblower. Such conclusions conflict with our Supreme Court's earlier rulings and dangerously distort the WPA.